# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JEFFREY MCGEHEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-cv-00873-TMP |
| | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an age discrimination case. Pending before the court is the Defendant Federal Express Corporation's Motion for Summary Judgment. (Doc. 30). The defendant seeks dismissal of the plaintiff's claim of alleged age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.* The motion has been fully briefed, and the parties have consented to dispositive jurisdiction by a United States Magistrate Judge in accordance with 28 U.S.C. § 636(c).

## I.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against

a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d

379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communications, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

## II.    FACTS

For purposes of summary judgment, the courts are directed to view the facts in the light most favorable to the non-moving party.  Accordingly, the following facts relevant to the instant Motion for Summary Judgment are either undisputed or taken in the light most favorable to the non-moving plaintiff.

McGehee was born on October 10, 1962.  (Doc. 33-1, p. 56:3-4).  In 1987, he began his employment with FedEx, working as a courier, which required him to load trucks and deliver packages.  (Doc. 33-1, pp. 63:5-7, 86:23 – 87:3, 87:7-18). He worked at the RLI Station in Homewood, Alabama, from 1987 until 2015, the year of his termination.  (Doc. 33-1, p. 65:6-14).

The chain of command at the RLI Station consisted of Operations Managers who reported to a Senior Manager (doc. 33-2, pp. 15:21 – 16:20), who in turn reported to an off-site Managing Director (see doc. 33-2, pp. 36:8 – 37:2) (describing that decision not to terminate an employee lies with the managing director, not with the senior manager).  During the relevant time period, McGehee's immediate supervisors were Operations Managers Chuck McGhee ("McGhee") and Robin Cooper ("Cooper").  Above McGhee and Cooper was Senior Manager Jannette Maye ("Maye") (doc. 33-1, pp. 74:12-20, 75:5-7; doc. 33-3, Declaration of Jannette Maye ¶ 3), and her supervisor was  Howard Morgan, serving as the Managing Director responsible for the RLI Station.  (See doc. 33-2,

p. 75:13-15).  According to McGehee, he reported directly to all of his managers. (Doc. 33-1, p. 74:12-17).

FedEx has developed policies delineating procedures and conduct that employees are expected to adhere to.  Specifically, FedEx Policy 2-5, "Acceptable Conduct" ("Acceptable Conduct Policy"), outlines the conduct expectations of FedEx employees and defines what constitutes misconduct.  (Doc. 33-1, Bates Number 9-36).  It is impermissible for an employee to become insubordinate or violate safety regulations cross-referenced in "The People Manual," which is FedEx's employee handbook.  (Doc. 33-1, Bates Numbers 9-36 – 9-37).  Under FedEx Policy 4-48 Driving Qualifications,[1] employees in driving positions may not drive with an invalid or suspended license.  Policy 4-48 states in relevant part:

> **State License/lnsurance Compliance.**  Employees who operate Company vehicles on public or Company property are responsible for the following:
>
> 1.  All drivers are responsible for and must know and comply with the CDL HME and driver's license and insurance requirements of the states in which they reside.

---

[1]  A safety specialist provides managers "all of the necessary documentation to ensure the policies and procedures for [Alabama] are adhered to and administered correctly."  (Doc. 33-2, p. 42:15-18).  The specialist makes the managers generally aware of Alabama motor safety laws, but not of every detail.  (Doc. 33-2, pp. 42:23 – 43:1).  The safety specialist will hold weekly conference calls, during which the specialist will update the managers on any "changes made to [Alabama]'s law."  (Doc. 33-2, p. 43:2-9).  If the specialist does not update the managers of changes during the weekly conference call, the specialist will provide the information in email form.  (Id.).  Notably, the specialist did not make the RLI Station's managers specifically "familiar with the licensing requirements in the State of Alabama."  (Doc. 33-2, p. 43:10-16).

2. All drivers must have valid CDL and HME/driver's license in their possession at all time.  A photocopy of their driver's license is not valid.

\* \* \*

5.  All employees who drive as regular part of their job whose CDL, HME or driver's license becomes invalid as defined in this policy must also notify their manager the next business day and before operating Company vehicle.

6.  The employee whose license becomes invalid must not operate Company vehicle.  Management must consult with Safety, HR, and Legal prior to allowing the employee to drive Company vehicle

(Doc. 33-1, Bates Number 9-74).[2]   Further, the same Policy defines "**Invalid License Status**," to include, "**Expiration**—If driver's license has expired, the employee cannot drive a vehicle or motorized conveyance on Company property or public roads until the license is renewed/valid."  (Doc. 33-1, Bates Number 9-74).  FedEx considers "[d]riving a FedEx Express vehicle on a license that is currently limited or was limited in the past (as defined in the Invalid License Status guideline of this policy). . . a serious violation of safety regulations…," resulting in immediate suspension pending an investigation.  (Doc. 33-1, Bates Number 9-75).  Further, "[a] manager may discover that an employee is currently driving or drove

---

[2]    Under Ala. Code § 32-6-1(b), "[a] grace period of 60 days after expiration date of a driver's license shall exist for the purpose of driver's license renewal and the driver's license shall be valid for this time period."

in the past on limited license (invalid License Status guideline). When this occurs the employee is given at a minimum a Warning Letter and one week unpaid suspension" (Doc. 33-1, Bates Number 9-75). Human Resources advisor Jacqueline Fields testified that FedEx personnel are "supposed to adhere to the policy true to form," yet also testified that there is no violation of the Policy if an employee drives with an expired license that remains "valid" under State law. (Depo. of Fields, doc. 36-1, p. 58).

Similarly, a Warning Letter is required for a "Preventable Backing Vehicle Accident"[3] under FedEx Policy 8-90 Vehicle Accidents/Occurrences. (Doc. 33-1, Bates Number 23-24).

Before issuing a disciplinary-action letter or deficiency notification, an Operations Manager will "share" the letter with the on-site Senior Manager. (Depo. of Fields, doc. 39-1, p. 62:15-23). Such letters are "courtesy copied" to the Senior Manager. (Depo. of Fields, doc. 39-1, pp. 62:15-23 through 63:1-4).

After receiving a disciplinary action for conduct in violation of the Acceptable Conduct Policy, an employee may utilize the Guaranteed Fair

---

[3] "A preventable accident or occurrence is one in which the FedEx Express operator failed to do everything possible to prevent the accident or occurrence, including anticipating the hazard. . . ." (Doc. 33-1, Bates Number 23-21). According to the policy, "[a]ll vehicle accidents must be investigated to include an onscene visit immediately by FedEx Express management regardless of the severity preventability and/or fault of the accident. . . . On the first working day after the accident, management reviews the details of the accident/occurrence and following established FedEx Express guidelines determines preventability." (Doc. 33-1, Bates Number 23-22).

Treatment Procedure ("GFTP") to challenge any received "disciplinary action, including termination" under FedEx Policy 5-5 Guaranteed Fair Treatment Procedure.  (Doc. 39-1, Bates Number 9-20).

The Acceptable Conduct Policy describes the consequences of receiving multiple disciplinary actions.  Specifically, the Acceptable Conduct Policy provides the following provisions:

**Recurrent Patterns.** . . . Any time a third discipline/deficiency notification of any type, i.e., Performance Reminder or Warning Letter, is entered . . ., an alert "notify" will be sent to the employee's senior manager and managing director and the matrix HR Advisor/Representative.  The "notify" will advise that the employee has three notifications, and the employee's history will be audited.

The receipt of three notifications of deficiency within a 12-month period normally results in termination.  However an employee's entire employment history should be reviewed. . . .

**Termination Option Exercised.** . . . Management is responsible for reviewing an employee's disciplinary record and exercising judgment in determining appropriate action.

**Discharge Approval.** Two levels of management and a matrix HR staff member must approve all terminations based on misconduct when the individual holds a managing director or below position. . . .

**Termination Option Not Exercised.** If a manager chooses not to discharge an employee who has three notifications of deficiency, the manager must prepare a written explanation of the rationale and maintain it permanently in a department/station file.

(Doc. 33-1, Bates Numbers 9-39—9-40). At the RLI Station, only the Managing Director may make the decision not to exercise the termination option under the Acceptable Conduct Policy, but the Senior Manager may provide a written "opinion on whether or not that [option should] be exercised." (Depo of Maye, doc. 33-2, pp. 36:8-22, 40:5-23; Depo of Fields, doc. 39-1, p. 84:5-8). Likewise, an Operations Manager may draft a written opinion to give to the Senior Manager, who will then decide whether to forward it to the Managing Director. (Depo of Maye, doc. 33-2, pp. 36:23 – 37:2). If the Managing Director decides not to exercise the termination option, the Managing Director can request either the Operations Manager or the Senior Manager to draft the written explanation setting out the rationale behind the decision. (Depo of Maye, doc. 33-2, pp. 40:24 – 41:4).

On June 17, 2014, McGehee received his first Warning Letter from Operations Manager McGhee for insubordination when he provided inaccurate stop counts to McGhee.[4] (Plaintiff's Depo, doc. 33-1, p. 90:4-15, 105:4-8; see also Depo of Fields, doc. 39-1, Bates Numbers 9-33 – 9-34). Maye and his HR Advisor were copied on the letter. (Depo of Fields, Doc. 39-1, Bates Number 9-33). He did not seek GFTP review of the June 17, 2014, Warning Letter issued for insubordination. (Plaintiff's Depo, doc. 33-1, pp. 104:12 – 105:8). He did not file a GFT because he had "filed one prior to this and there was" not a good result.

_____

[4] It appears form the evidence that a stop count is a total of the number of morning and afternoon deliveries.

(Plaintiff's Depo, doc. 33-1, p. 104:18-22). He further claimed that "[i]t didn't work" and "[t]hat's why [he] didn't file it for this one." (Plaintiff's Depo, doc. 33-1, p. 104:18-22).

Plaintiff received his second Warning Letter from McGhee on February 23, 2015, for driving on an expired license. (Plaintiff's Depo, doc. 33-1, pp. 109:2 – 111:20; <u>see also</u> Depo of Fields, doc. 39-1, Bates Numbers 9-57 – 9-58). Maye and his HR Advisor were copied on the letter. (Depo of Fields, doc. 39-1, Bates Number 9-57). His license expired on February 7, 2015, and he admits that he drove his FedEx vehicle between February 7 and February 22. (Plaintiff's Depo, doc. 33-1, p. 111:5-20). When he discovered that his license had expired on February 22, 2015, he self-reported the license expiration to his Operations Manager, McGhee. (Plaintiff's Depo, doc. 33-1, pp. 109:14 – 110:22). McGehee's managers allowed him to work the following day, on February 23, 2015, but his managers did not permit him to drive a FedEx truck; instead, his managers required another employee to drive and allowed McGehee to ride along and deliver packages. (Doc. 33-1, p. 110:8-22). At lunch, he renewed his license and returned to work that afternoon, driving his FedEx vehicle by himself. (Plaintiff's Depo, doc. 33-1, p. 110:8-22, 118:4-21).

McGhee issued the plaintiff a Warning Letter and placed him on a five-day suspension without pay after he had worked that day. (Depo of Fields, doc. 39-1,

Bates Numbers 9-57 – 9-58; see also Plaintiff's Depo, doc. 33-1, pp. 121:21 – 122:6). The Warning Letter notified McGehee of the Acceptable Conduct Policy and the consequences of receiving three letters within a twelve-month period. (Depo of Fields, doc. 39-1, Bates Numbers 9-57 – 9-58). He did not, however, seek GFTP review of the February 23, 2015, Warning Letter for driving on an expired license because he was told by an HR Advisor, "You can [file a GFT], but you won't win it. It won't do you any good." (Plaintiff's Depo, doc. 33-1, pp. 120:20 – 121:2). Despite not filing a GFT, McGehee believes his managers should not have issued him a Warning Letter because his managers worked him that day instead of immediately issuing a Warning Letter and suspending him that morning when he arrived at work, pursuant to policy. (Doc. 33-1, pp. 119:15 – 120:13). McGehee was paid for February 23, 2015, and, because his managers "used" him that day, his suspension was reduced to four days. (Doc. 33-1, p. 120:14-19).

McGehee was terminated on June 2, 2015, after he received a third Warning Letter within a twelve-month period in violation of the Acceptable Conduct Policy. (Plaintiff's Depo, doc. 33-1, p. 142:5-11; see also Depo of Fields, doc. 39-1, Bates Numbers 9-30 – 9-31). Specifically, he received his third Warning Letter on June 2, 2015, from Operations Manager Robin Cooper for backing "into a parked car [and] causing damage to the vehicle" on May 27, 2015, in violation of the Acceptable Conduct Policy. (Doc. 39-1, Bates Numbers 9-30 – 9-31). Maye and

the plaintiff's HR Advisor were copied on the letter. (Depo of Fields, doc. 39-1, Bates Number 9-30). McGehee "accept[ed] responsibility for backing into a car." (Plaintiff's Depo, doc. 33-1, p. 170: 3-4).

Before Cooper issued the June 2, 2015 Warning Letter to McGehee, Senior Manager Maye sent an email to her Managing Director and an HR Advisor on May 28, 2015, writing:

> Jeff McGehee [employee number] posted a preventable backing accident yesterday. Policy dictates this employee receive at minimum a Warning Letter.
>
> Jeff has two letters issued within the last twelve months, so we placed him on paid suspension on yesterday.
>
> Before issuing the WL which will terminate his employment of 20+ years are there exceptions to termination that have been granted in the district?

(Depo of Fields, doc. 39-1, Bates Number 32-7; Depo of Maye, doc. 33-2, Bates Number 32-13).[5] Maye's Managing Director, Howard Morgan, replied to her email, saying, "Let's discuss on Monday, once Irene returns. I don't believe there

---

[5] Although Maye further testified that she was asking for an exception on McGehee's behalf (doc. 33-2, pp. 69:2 – 70:3), McGehee disputes that she did in fact ask for an exception; however, McGehee does not have a basis of knowledge to dispute whether or not she asked for an exception (doc. 33-1, p. 170:15 – 171:22). Additionally, Maye summarized a telephone conversation that she had with her Managing Director: "McGehee has been around for 20-plus years, one of the letters will be dropping off in less than 30 days, have there . . . been any exceptions – or can you grant an exception not to terminate him." (Doc. 33-2, p. 77:6-11). The HR advisor confirmed that Maye asked for an exception when Maye spoke to her. (Doc. 39-1, p. 81:6-11). Therefore, the court views the undisputed facts to demonstrate that Maye did ask for an exception based on the quoted portion of the email and her subsequent testimony.

is an exception I can make at the District level, but perhaps there is something that can be done at levels above me." (Doc. 33-2, Bates Number 32.13). Plaintiff McGehee's first Warning Letter (dated June 17, 2014) was less than thirty days from "dropping off," meaning that it would be outside the 12-month window of the Acceptable Conduct Policy and that termination would not have been warranted with the issuance of the June 2, 2015, Warning Letter if he had received the Warning Letter after June 18, 2015. (Depo of Fields, doc. 39-1, Bates Number 32-1). The HR Advisor informed Maye, by telephone, that no similar exceptions had been granted. (See Depo of Fields, doc. 39-1, p. 81:2-19). Therefore, McGehee was terminated upon receipt of the June 2, 2015 Warning Letter. (Plaintiff's Depo, doc. 33-1, p. 142:5-11).

Following his termination, McGehee initiated GFTP review of his termination, but not the subject-matter of the June 2, 2015, Warning Letter, that he had backed into a parked vehicle. (Plaintiff's Depo, Doc. 33-1, Bates Number 9-92).[6] McGehee wrote that he understood "FedEx policy and the reason management had to issue a letter." (Plaintiff's Depo, doc. 33-1, Bates Number 9-91). The Appeals Board upheld his termination. (Doc. 33-5, Bates Number 7-2).

---

[6] "You added that you filed the GFT not to challenge this letter but with the hope that your overall performance history would be considered and your employment be reinstated as a result." (Doc. 33-1, Bates Number 9-92).

McGehee has offered evidence that Jonathan Moore ("Moore") and Brian Shirley ("Shirley") received different treatment at the RLI Station under the Acceptable Conduct Policy. First, Moore, who was under the age of forty at the relevant time period, received four deficiency notifications (*i.e.*, performance reminders) before he was terminated. (Doc. 39-1, Bates Numbers 30-125 to 30-127, 30-132 to 30-133, 30-128 to 30-129, 30-134 to 30-135). Notably, Maye was copied on all four Performance Reminders issued to Moore by two different Operations Managers (id.) and testified that she saw the Performance Reminders at some point in time (see e.g., Depo of Maye, doc. 33-2, pp. 58:3-6, 60:10-16).[7] Maye consulted with Cooper on the July 28, 2014, Performance Reminder issued to Moore that resulted in his termination. (Doc. 39-1, Bates Number 30-134).[8]

The third and fourth Performance Reminders that Moore received contained errors. The third Performance Reminder, dated July 11, 2014, and signed by Operations Manager Thomas Bell ("Bell") (Doc. 39-1, Bates Numbers 30-128 to 30-129), mistakenly stated that it was Moore's second Performance Reminder, when it was actually his third. (Doc. 39-1, Bates Numbers 30-128). The fourth

---

[7]     Notably, Maye testifies that she "probably" reviewed Moore's Third Performance Reminder "within a few weeks" of it being issued on July 11, 2014. (Doc. 33-2, p. 58:3-6).

[8]     Although Maye testifies that she does not know if she "saw [the July 28, 2014, Performance Reminder] when it was issued" (doc. 33-2, p. 60:13-25), the Acceptable Conduct Policy requires two managers and a HR Advisor to be involved in a termination decision. Therefore, the court views in favor of the non-movant that Maye was contemporaneously involved with the decision to issue the July 28, 2014, Performance Reminder that led to Moore's termination because she was copied on the letter. (See doc. 39-1, Bates Numbers 9-40, 30-134).

Performance Reminder issued to Moore by Operations Manager Cooper on July 28, 2014, likewise contained an error, indicating that it was his third Performance Reminder in twelve months instead of his fourth. (Doc. 39-1, Bates Numbers 30-134 to 30-135). Notably, the July 28, 2014, Performance Reminder did not mention the May 14, 2014, Performance Reminder. (Doc. 39-1, Bates Numbers 30-134 to 30-135).

Second, Bryan Shirley, who was also under the age of forty at the relevant time, was granted a termination exception after receiving his third deficiency notification on June 13, 2007. (Doc. 33-2, p. 49:4-12). Luke Lael ("Lael"), who was one of Shirley's Operations Managers at that time, sent a memorandum to Maye on June 13, 2007, requesting an exception from the termination policy for Shirley. (Doc. 33-2, Bates Number 32-41). Lael sent the memorandum by email to an HR Advisor on June 26, 2007, copying Maye and then-Managing Director, Randy King ("King"). (Doc. 33-2, p. 52:3-7; doc. 33-2, Bates Number 32-40). Maye forwarded the memorandum to an HR Advisor and King "for their approval." (Doc. 33-2, p. 52:17-23). In January and February of 2008, the HR advisor requested from Maye the rationale for not terminating Shirley. (Doc. 33-2, pp. 52:24 – 53:6; doc. 33-2, Bates Number 32-38). Maye ordered Lael to forward the memorandum to the HR Advisor at that point (doc. 33-2, Bates Number 32-38), and Lael did so on February 1, 2008 (doc. 33-2, Bates Number 32-40).

FedEx offers evidence of the only employees, in addition to McGehee, who were terminated from July 1, 2013, to December 31, 2015, for receiving three deficiency notifications within a twelve-month period. (Doc. 33-3, ¶¶ 4, 5). Specifically, these nine employees were between the ages of nineteen to twenty-nine at termination. (Doc. 33-3, ¶¶ 4, 5).

## III.  DISCUSSION

Under the ADEA, an employer shall not "discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). ADEA exclusively limits the protected class to individuals over the age of forty. 29 U.S.C. § 631(a). Furthermore, "[a] plaintiff must prove by a preponderance of the evidence" through either direct or circumstantial evidence "that age was the 'but-for' cause of the challenged employer decision" to assert a disparate treatment claim pursuant to ADEA. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78, (2009); see also Mora v. Jackson Mem'l Found., Inc., 597 F.3d 1201, 1204 (11th Cir. 2010) ("an ADEA plaintiff must establish 'but for' causality").

Because direct evidence of discrimination does not exist in this case, the court must apply "the burden shifting framework in McDonnell Douglas Corp. v. Green," 411 U.S. 792 (1973) when a disparate treatment claim under ADEA relies on circumstantial evidence. Sims v. MVM, 704 F.3d 1327, 1332 (11th Cir. 2013);

see also Liebman v. Metro. Life Ins. Co., 808 F.3d 1294, 1298 (11th Cir. 2015).

Under the McDonnell Douglas framework, "the plaintiff must first establish a prima facie case of discrimination." Sims, 704 F.3d at 1332; see also Horn v. United Parcel Services, Inc., 433 F. App'x 788, 792 (11th Cir. 2011). "Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally." Trask v. Sec'y, Dept. of Veteran Affairs, 822 F.3d 1179, 1191 (11th Cir. 2016) (quoting Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). "Next, the defendant must articulate a legitimate, non-discriminatory reason for the challenged employment action [to rebut that presumption.] . . . If the defendant articulates one or more such reasons, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination." Sims, 704 F.3d at 1332. "The burden of persuasion always remains on the plaintiff in an ADEA case to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the 'but-for' cause of the adverse employment action." Id.

### A. *Prima Facie* Case

When a plaintiff establishes a *prima facie* case, the plaintiff "creates a presumption of unlawful discrimination." Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012). To establish a *prima facie* case of age

discrimination, the plaintiff must show that: "(1) he was a member of the protected group. . .; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged." Liebman, 808 F.3d at 1298. Under the third prong, "even if a plaintiff is not replaced by a member outside his protected class, he may still satisfy [that] prong of the *prima facie* case requirement by identifying similarly situated comparators outside of his protected class who were treated more favorably." Horn, 433 F. App'x at 792 (citing Nix. v. WLCY Radio/Rahall Comm'ns, 738 F.2d 1181, 1185-86 (11th Cir. 1984). The first, second, and fourth prongs[9] of the *prima facie* case are not in dispute. The only issue is whether McGehee experienced different disciplinary outcomes when compared to similarly situated FedEx employees.

FedEx argues that McGehee failed to satisfy the third prong of his *prima facie* case: that a similarly situated employee was treated differently. McGehee

---

[9]      FedEx argues that McGehee was not qualified for his job based on the three Warning Letters he received in 2014 and 2015. However, McGehee was clearly qualified for the job based on his twenty-seven year tenure in same position with FedEx. See Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th Cir. 2001) ("We have recognized that in termination cases, the question of whether the plaintiff was qualified to do the job is not often at issue. '[I]n cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred.' *Rosenfield v. Wellington Leisure Products, Inc.,* 827 F.2d 1493, 1495 n. 2 (11th Cir. 1987). Thus, 'allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered... when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination.' *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1360 (11th Cir. 1999)"). The court is satisfied there is no genuine issue of fact regarding whether McGehee was "qualified" for the job as a FedEx courier.

identifies Jonathan Moore and Bryan Shirley as comparators. "A relevant comparator is an employee who is similarly situated to the plaintiff 'in all relevant respects.'" Horn, 433 F. App'x at 792 (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004)). A comparator is similarly situated if "the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Horn, 433 F. App'x at 793 (quoting Burke–Fowler v. Orange Cnty., 447 F.3d 1319, 1323 (11th Cir. 2006)). "The comparator must be 'nearly identical' to the plaintiffs to prevent courts from second-guessing a reasonable decision by the employer." Trask, 822 F.3d at 1192 (quoting Wilson, 376 F.3d at 1091)). For a FedEx employee to be used a comparator, McGehee "must show that a similarly-situated individual outside of [his] protected class" received different treatment under the Acceptable Conduct Policy under circumstances similar to his. Trask, 822 F.3d at 1192 (citing Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003)). While relevant, it is not dispositive "that different decisionmakers were involved in administering discipline." Horn, 433 F. App'x at 793 (citing Anderson v. WBMG-42, 253 F.3d 561, 566 (11th Cir. 2001)).

As comparators to the plaintiff, both Moore and Shirley are outside of the protected class. At issue is (1) whether their situations were nearly identical to McGehee's situation and (2) whether they received more favorable treatment under

the Acceptable Conduct Policy. It is undisputed that Shirley received more favorable treatment under the Acceptable Conduct Policy when management granted him an exception from termination but did not do the same for McGehee. In Moore's situation, the first and second issues are intertwined.

The court acknowledges that it is a close question whether Shirley is a proper comparator. Although McGehee was due to be issued a third Warning Letter after he violated the Acceptable Conduct Policy, Maye requested a termination exception for McGehee. FedEx, however, ultimately did not grant McGehee an exception. The third Warning Letter was subsequently issued, and McGehee was terminated because it was his third within a twelve-month period.

McGehee asserts that Maye was involved in the decision to request a termination exception on behalf Shirley and that Shirley ultimately received more favorable treatment under the Acceptable Conduct Policy. FedEx argues that Maye did not request a termination exception for Shirley, but merely passed along Lael's opinion that Shirley should be given an exception, and that Shirley's situation is neither sufficiently nor temporally related to the plaintiff's. In other words, FedEx asserts that different managers were involved in Shirley's situation when compared with McGehee's situation. Further, McGehee's termination occurred approximately eight years after Shirley's discipline.

Viewing the facts and reasonable inferences in the light most favorable to McGehee, the non-movant, the evidence establishes that Maye was involved in the decision to request a termination exception for Shirley. As Maye testified, only the Managing Director (her supervisor) may make the decision not to terminate an employee under the Acceptable Conduct Policy, but the Senior Manager (Maye) may provide a written "opinion on whether or not that [option should] be exercised." (Depo. of Maye, doc. 33-2, pp. 36:8-22, 40:5-23; Depo. of Fields, doc. 39-1, p. 84:5-8). Likewise, an Operations Manager (Maye's subordinate—in this case, Cooper) may draft a written opinion to give to the Senior Manager, who then decides whether to forward it to the Managing Director. At the time of Shirley's discipline, Luke Lael ("Lael") was one of Shirley's Operations Managers. He sent a memorandum to Maye (who was the Senior Manager) on June 13, 2007, requesting a termination exception for Shirley. Lael sent the memorandum by email to an HR Advisor on June 26, 2007, copying Maye and King, who was the then-Managing Director. Maye forwarded the memorandum to the HR Advisor and King "for their approval." (Depo of Maye, doc. 33-2, p. 52:17-23).[10] Because

---

[10] Plaintiff's testimony that Shirley told him that Maye made the decision to seek an exception to termination for Shirley (Plaintiff's Depo, doc. 33-1, pp. 207:20 – 208:1) is patent hearsay and cannot be considered. The testimony is being offered to prove the truth of the matter asserted to plaintiff by Shirley. Further, Shirley's assertion that Maye made the decision appears to be pure speculation on his part in light of the documentary evidence showing that it was Lael who requested the exception.

Maye decided to forward Lael's request to King, she was more than passively involved in the decision to request an exception for Shirley.

Because Maye asked for an exception on behalf of McGehee and was involved in Shirley's exception request, it appears that Shirley's situation is nearly identical to McGehee's situation. The only material difference between the two situations is that Shirley received a termination exception, whereas McGehee did not. It was not Maye, however, who made the decision to grant or deny termination the exceptions for either Shirley or McGehee. Only King, the then-Managing Director, could have approved a termination-exception request on behalf of Shirley, and only Morgan, the current Managing Director, could have denied the exception request on behalf of McGehee. That the decisions made in these two situations, eight years apart, were made by two different Managing Directors severely undermines any claim of discrimination. See Galdamez v. DHL Air Exp. USA, 578 F. App'x 887, 892 (11th Cir. 2014) (quoting Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1261 n.5 (11th Cir. 2001)) ("differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination."). While not dispositive, actions by different supervisors raise questions about whether the plaintiff and his purported comparator or sufficiently similar. Citing Silvera, the Court of appeals has emphasized that, "at least in disciplinary contexts, that the quality and quantity of a comparator's conduct must

be nearly identical to the plaintiff's in order to prevent courts from second-guessing a reasonable decision by the employer. Maniccia v. Brown, 171 F.3d 1364, 1368–69 (11th Cir.1999). While not always the case, differences in treatment by different supervisors or decisionmakers can seldom be the basis for a viable claim of discrimination." Foster v. Biolife Plasma Servs., LP, 566 F. App'x 808, 811 (11th Cir. 2014); see also Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1312 n. 7 (11th Cir.) (stating that individuals with different supervisors than the plaintiff "may be sufficient to prevent them from being considered 'similarly situated' with Plaintiff"), superseded in other part by, 151 F.3d 1321 (11th Cir.1998). The great difference in time between the Shirley and McGehee's situations also militate against finding the situations are nearly identical. See Davis v. NPC Pizza Hut, 447 F. Supp. 2d 1260, 1270 (N.D. Ala. 2006) (finding eight years between employment decisions "too distant")

Also, beyond involving different decisionmakers at different times, the court is required to examine the "the quality and quantity of a comparator's conduct" to determine whether it is sufficiently similar to the conduct for which the plaintiff received a different form of discipline. See Maniccia v. Brown, 171 F.3d 1364, 1368–69 (11th Cir.1999). Plaintiff received three Warning Letters for (1) insubordination for misleading his supervisor about the number of deliveries he made, (2) unknowingly driving while his driver's license was expired, and (3)

causing a loss by accidentally backing into a parked vehicle. By comparison, Shirley received three Warning Letters eight years earlier for (1) operating company vehicle while using a cell phone (doc. 33-2, Bates Number 26-22), (2) failure to enter timecard codes during a day (doc. 33-2, Bates Number 26-26), and (3) failure to make timely delivers due to failure to communicate with dispatch and adjust his route as needed. (Doc. 33-2, Bates Number 26-25). The court has little difficulty concluding that the nature of the conduct for which Plaintiff McGehee was disciplined is not sufficiently similar to Shirley's that Shirley can be a proper comparator. Plaintiff's conduct was plainly more serious than Shirley's. He had be insubordinate to a supervisor, had driven a company vehicle for almost two weeks (albeit unwittingly) with an expired driver's license, and he had a preventable accident causing damage to a parked car. Shirley's misconduct involved failure to make time entries and failure to make timely deliveries. It appears to the court that is most serious misconduct was driving while using a cell phone. Comparing the misconduct alleged for these two employees, it is not surprising that the plaintiff was not accorded the same exception to termination that Shirley was. Shirley is not a proper comparator to the plaintiff.

McGehee also argues that Jonathan Moore is a proper comparator. He asserts that Moore received three Performance Reminders within a twelve-month period for lack of punctuality, but he was not terminated under the Acceptable

Conduct Policy.  In fact, Moore was terminated only after he received a fourth Performance Reminder.  FedEx argues that Moore received the third Performance Reminder in error and that "the record belies th[e] suggestion" that Maye was involved as a decision-maker in Moore's situation."  (Doc 37, p. 10).

Viewing the facts and reasonable inferences in the light most favorable to McGehee, the non-movant, the evidence shows that Maye knew that Moore received his third Performance Reminder on July 11, 2014, which should have resulted in his termination pursuant to the Acceptable Conduct Policy.  Operations Manager Robin Cooper issued the first two Performance Reminders to Moore, pointing out his failure to get to work on time.  The third Performance Reminder for punctuality problems, however, was issued by a different Operations Manager, Thomas Bell, and mistakenly stated it was Moore's *second* Performance Reminder (when, in fact, it was the third).  Maye was copied on all four of the Performance Reminders issued to Moore between May and July of 2014.  The Acceptable Conduct Policy dictates that two members of Management and an HR Advisor "must approve all terminations."  (Doc. 39-1, Bates Number 9-40).  Each Warning Letter or Performance Reminder received by an employee is signed by a manager with copies to an additional manager and HR Advisor, and Fields, the HR Advisor testified that, before issuing a disciplinary action, an Operations Manager "will normally share" a Warning Letter  with the Senior Manager.  (Depo. of Fields, doc.

39-1, p. 62:15-23).[11]    Although Maye testified that she "probably" reviewed Moore's third Performance Reminder "within a few weeks" of it being issued (doc. 33-2, p. 58:3-6), the evidence is sufficiently in dispute that the court must view the fact in the light most favorable to McGehee.  Maye at least received a copy of the third Performance Reminder before it was issued.  As a result of the error in the third Performance Reminder, FedEx allowed Moore to work an additional two weeks before he was ultimately terminated after receiving a fourth Performance Reminder on July 28, 2014.

Again, the court concludes that Moore's and McGehee's situations were not sufficiently similar to be comparators.  Although it is true that Moore was not terminated upon receiving his third Performance Reminder, that appears to be nothing more than an error, not a contemplated decision by Maye or FedEx.  In other words, management took no action in response to Moore's third Performance Reminder when the Acceptable Conduct Policy dictated some action because they mistakenly did not recognize that it was Moore's *third.*    Silvera, 244 F.3d at 1262 instructs the court that "[d]iscrimination is about actual knowledge, and real intent,

---

[11]    McGehee testified that "Maye made all decisions at that station" (doc.33-1, p. 207:18-19) and "[n]othing goes past her" as the head of the RLI Station (doc. 33-1, p. 252:17, 20).  The court takes this testimony with great caution because McGehee has no personal knowledge of these purported facts.  While he can offer his direct observations of how involved Maye was in the operation of the RLI station, he has no way of knowing personally that she "made all the decisions."   He has no direct observation of Maye's interaction with and reliance on her Operations Managers, or how much she was directed by her superior Managing Director.  His testimony amounts to speculation or hyperbole.

not constructive knowledge and assumed intent." Certainly, discrimination cannot be predicated on a showing that managers made a factual mistake by failing to recognize that Moore had three, not just two, Performance Reminders. What they would have done had they correctly recognized the third Performance Reminder as being Moore's third is nothing but speculation at this point. Stated simply, Moore was not treated more favorably than McGehee because he was younger than the plaintiff, but because he benefitted from a mistake. This is the opposite of intentional discrimination.

Because the plaintiff cannot show a proper comparator for purposes of the third element of the *prima facie* showing for an age-discrimination claim, his claim fails. Absent a showing that a "substantially similar" comparator outside the protected class received better treatment than the plaintiff, he cannot establish a *prima facie* case of age discrimination, and the claim is due to be dismissed.

### B. FedEx's Legitimate Non-Discriminatory Reason and Pretext

Even assuming that McGehee has established a *prima facie* case under the McDonnell Douglas framework, the motion for summary judgment still is due to be granted. Once the *prima facie* case has been established, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action to rebut the presumption of discrimination under McDonnell Douglas.

Trask, 822 F.3d at 1191. Here, FedEx argues that it terminated McGehee for receiving three Warning Letters within a twelve-month period, as is normally required by the Acceptable Conduct Policy. McGehee does not dispute the existence or normal application of the Acceptable Conduct Policy. He only asserts that FedEx should not have terminated him in this situation, but instead should have granted him an exception from the policy based on his tenure. FedEx has articulated a legitimate, non-discriminatory reason for terminating McGehee and, thus, has satisfied its burden of production.

FedEx's articulation of a legitimate, non-discriminatory reason for McGehee's termination shifts the burden to McGehee "to produce evidence that the employer's proffered reasons are a pretext for discrimination." Trask, 822 F.3d at 1191 (quoting Alvarez, 601 F.3d at 1264). McGehee must meet FedEx's articulated reason "head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom" of FedEx's reason. Alvarez, 610 F.3d at 1266. McGehee "can do so . . . indirectly, by showing 'such weaknesses, implausbilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Alvarez, 610 F.3d at 1265. Because FedEx offers McGehee's "violation of a work rule as its reason for the termination, the reason 'is arguably pretextual'" if McGehee presents evidence that, "'if [he] did violate

the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated.'" Addison v. Ingles Markets, Inc., 515 F. App'x 840, 843 (11th Cir. 2013) (quoting Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1363 (11th Cir. 1999)). Finally, "an employer who treats two employees differently because of a mistaken belief in the existence of a neutral reason does not violate [ADEA]." Silvera, 244 F.3d at 1261 (citing Wolf v. Buss (America) Inc., 77 F.3d 914, 919 (7th Cir. 1996) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.")).[12]

FedEx asserts that its articulated reason is not a pretext, based on its proffer of evidence showing that of ten employees terminated for violation of the Acceptable Conduct Policy, the nine were under the age of thirty. Only the plaintiff was over the age of forty. Additionally, the plaintiff's reliance on Moore and Shirley as comparators is flawed. As already explained above, Shirley's discipline conduct is not of the same seriousness as the plaintiff's, which reasonably could justify different forms of discipline. Further, Moore's different treatment was the product of a mistake, not a deliberate decision.

---

[12]    McGehee argues that FedEx's citation to Wolf is not applicable on these facts, specifically asserting that "a mistake on the grounds in favor of the comparator is not the holding of Wolf." (Doc. 36, p. 20 n.9). McGehee fails to appreciate that Silvera cites to Wolf for the basic principle that pretext cannot be proven by a mistake, and in fact, Silvera stands for the proposition that a mistake in favor of the comparator cannot support a violation of Title VII and, by implication, ADEA.

Furthermore, FedEx argues that Maye, in fact, requested a termination exception on McGehee's behalf, meaning that its articulated reason is not pretext. In Addison, the Eleventh Circuit held, in part, that the plaintiff could not establish that the defendant's stated reason was pretext for three reasons. 515 F. App'x at 843. First, "Addison admitted that she was guilty of violating the anti-theft policy." Id. Second, the defendant terminated "all fourteen employees accused of violating this policy—nine African American and five Caucasians." Id. Third, "the record shows that the manager attempted to excuse Addison's violation and only fired her once he learned that he could not make an exception for her." Id. Addison's holding is immensely persuasive on the facts of the instant case, even though it was decided in the Title VII race discrimination context. Like Addison, McGehee admitted that he violated the Acceptable Conduct Policy and understood the reason why he was terminated. FedEx likewise has come forward with nine employees under the age of forty who also were terminated under the Acceptable Conduct Policy during the same timeframe. Finally, Maye requested a termination exception on McGehee's behalf and only terminated him once it was clear that an exception would not be made, just as in Addison's case.

In response, McGehee argues (1) that Maye did not request an exception for him and (2) that her proffered reasons for not requesting a termination exception show that FedEx's articulated reason is pretext. This argument fails because it

requires the court to accept speculation upon speculation. Although Maye's email, which inquires about previous exceptions, is ambiguous, Maye and the HR Advisor's testimony supports a conclusion that Maye did, in fact, request a termination exception on McGehee's behalf. McGehee fails to come forward with any substantial evidence to dispute this testimony. Instead he asks the court to deny summary judgment so that the jury can determine the credibility of FedEx's proffered evidence based upon unreasonable inferences and inaccurate statements of FedEx policy. The court declines to do so. Based upon Addison and because Maye requested a termination exception for McGehee, FedEx has demonstrated that its articulated reason is not pretext.

McGehee has offered two additional reasons why FedEx's articulated reason should be considered pretext. First, McGehee contends that his second Warning Letter, issued on February 23, 2015, was not legitimate and should not have been issued, even though he did not challenge it at the time he received it. According to McGehee, he reported his license expiration to his manager on February 22, 2015. Although his license had expired on February 7, 2015, he argues that his license was still valid under Alabama law when he reported it expired because the 60-day grace period for renewal of licenses provided by Ala. Code. § 32-6-1(b) had not

lapsed.  (See doc. 35, pp. 23-25).[13]  According to FedEx's corporate representative, managers are "supposed to adhere to the policy true to form," and she confirmed that "an employee [who] has an expired license that is still legally valid" has not violated FedEx Policy 4-48 Driving Qualifications.  (Doc. 39-1, p. 58:15-22).  Therefore, he contends that he did not in fact violate FedEx Policy 4-48 Driving Qualifications because he operated his FedEx vehicle on a valid, but expired, license and that he should not have received the February 23, 2015, Warning Letter.  (See doc. 35, pp. 23-25).  Because he should not have received the February 23, 2017, Warning Letter, McGehee argues that he did not acquire three Warning Letters within a twelve-month period and that his termination subsequently was not warranted.  (Id.).

However, McGehee did not seek GFTP review of the February 23, 2015, Warning Letter.  He asserts that he did not seek GFTP review because he was told by an HR Advisor: "You can [file a GFT], but you won't win it. It won't do you any good."  (Id.).  However, McGehee only believed that he had grounds for GFTP review because his managers failed to follow policy regarding discipline (i.e., his managers worked him the day after learning of his expired license instead of immediately suspending him for five days pursuant to policy).  (Doc. 33-1, pp.

_____

[13]     Under Ala. Code. § 32-6-1(b), "[a] grace period of 60 days after expiration date of a driver's license shall exist for the purpose of driver's license renewal and the driver's license shall be valid for this time period."

119:15 – 120:13).  Importantly, he did not believe that he had grounds for GFTP review because he had violated the policy.  His self-reporting indicates that he believed that he had violated that policy. Irrespective of that statement, nothing prevented McGehee from pursuing GFTP review of the February 23, 2015, Warning Letter.  He could have simply ignored the HR Advisor's statement and proceeded with GFTP review.

More important, this argue flies in the face of the plain language of the FedEx Policy, which defines "**Invalid License Status**" to include, "**Expiration—** If driver's license has expired, the employee cannot drive a vehicle or motorized conveyance on Company property or public roads until the license is renewed/valid."  (Doc. 33-1, Bates Number 9-74).  Regardless of whether, known or unknown to FedEx, Alabama law provided a 60-day grace period, FedEx had the right as an employer to strictly prohibit its drivers from driving company vehicles with an "expired" license.  There are several reasons, including compliance with its liability-insurance requirements, why an employer would prohibit employees from driving company vehicles with an expired license.  That Alabama allows a grace period for renewal of the license does not answer these concerns of the employer.

Second, McGehee argues that the individuals involved in his GFTP review examined more than his three Warning Letters, considering information

"exemplary of age." The thrust of the argument is as follows: "*if* [FedEx] examined disciplinary history outside of the three-letters, then [FedEx] also examined [McGehee]'s Leave of Absence history, and therefore can conclude that [FedEx] also considered that [McGehee] is an older employee with health issues, causing him to miss work . . . and it is time for him to go." (Doc. 36, p. 26) (emphasis added). The premise of McGehee's argument is founded upon unsupported speculation and unreasonable inferences cannot support a finding that FedEx's articulated reason is pretext. The court declines, once again, to engage in speculative reasoning. The record simply does not contain any evidence to support a conclusion that McGehee's termination was upheld for any discriminatory reason considered during GFTP review.

Even viewing the evidence in the light most favorable to the non-movant, McGehee, there is not sufficient evidence to allow a reasonable juror to determine (1) that FedEx's articulated reason is pretext, but more importantly, (2) that a discriminatory reason was the "but-for" cause of the decision to terminate McGehee.

## IV. CONCLUSION

Accordingly, FedEx's motion for summary judgment is due to be GRANTED, and McGehee's sole claim of age discrimination under ADEA is due to be DISMISSED WITH PREJUDICE.

A separate order will be entered.

DATED this 21st day of March, 2018.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE